UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LOUIS Y. FISHMAN, AS THE                    CIVIL ACTION
INDEPENDENT EXECUTOR OF THE
SUCCESSION OF ELISE Y.
FISHMAN, ET AL

VERSUS                                      NO: 10-2

MORGAN KEEGAN & COMPANY                     SECTION: "J" (2)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court is a securities fraud suit seeking damages for alleged misrepresentations and omissions in connection with the purchase of certain Auction Rate Securities ("ARS"). Plaintiffs filed suit against Morgan Keegan on January 4, 2010, alleging violations of (1) Section 17(a) of the Securities Act of 1933 ("Securities Act"); Sections 10(b) and 15© of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 of the Code of Federal Regulations; (3) Sections 712 and 714 of Louisiana's Blue Sky Law; and (4) the Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTEA").  The Court granted in part

Defendant's Motion for Judgment on the Pleadings (Rec. Doc. 31),
dismissing the Plaintiffs' claims pursuant to Section 17(a) of
the Securities Act, Section 15© of the Exchange Act, and LUTEA.
Accordingly, Plaintiffs' only remaining claims allege violations
of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated
thereunder, as well as Louisiana's Blue Sky Law.  A bench trial
on the merits was held on August 29, 2011, and the Court took
this matter under advisement.  Upon consideration of all of the
evidence and argument of counsel, and pursuant to Federal Rule of
Civil Procedure Rule 52(a), the Court issues the following
findings of fact and conclusions of law.

**FINDINGS OF FACT**

I. **The Parties**

1.  Defendant Morgan Keegan is a registered securities broker-
    dealer based in Memphis, Tennessee that offers financial
    products and services, including securities brokerage,
    underwriting, and sales.  It was a major participant in
    the market for Auction Rate Securities, having
    underwritten, marketed, and sold ARS.

2.  Plaintiffs are Louis Y. Fishman ("Mr. Fishman"), as
    Independent Executor of the Succession of Elise Y.
    Fishman, Louis Y. Fishman in his individual capacity ("and

2

as successor by operation of law to Louis Y. Fishman and
Ann C. Fishman, as Trustees of Testamentary Trust II under
the Will of Ralph H. Fishman.

## II. <u>Auction Rate Securities</u>

3.   The facts giving rise to the case before the Court
involves the purchase by the Plaintiffs of certain ARS
underwritten by Defendant, Morgan Keegan and Company
("Morgan Keegan").

4.   ARS, which were first introduced in the early 1980's, are
long-term bonds or preferred stocks that pay interest or
dividends at rates of interest that vary and that are set
at periodic competitive auctions held every 7, 28, 35, or
48 days.  These auctions were conducted as "Dutch
auctions," in which sellers offered their ARS for sale at
the auction price, and buyers placed bids for the dollar
amount of the ARS they wished to purchase at the minimum
interest or dividend rate they were willing to accept.
Then, the interest rate for the security was set at the
lowest interest rate necessary for all of the ARS offered
for sale at that auction to be sold, based on the bids
submitted.  This rate, often referred to as the "clearing
rate," applied to all ARS sold at the auction.

3

5.  In addition to setting the interest rate for the security, the periodic auctions functioned to provide investors liquidity.  An ARS investor could sell his ARS at auction, provided that there were a sufficient number of bids to absorb the number of sell orders.  If there were insufficient bids to sell all the ARS offered for sale at the particular auction, however, the auction failed, and sellers were unable to liquidate their investment until the next successful auction.  The ARS investor would also continue to receive interest or dividend payments on each reset date, even if the auction failed.

6.  Auction failures also affected the security's interest rate.  If an auction failed, the interest rate reset to a "penalty" interest rate until the next successful auction. The penalty rate was provided in the ARS offering documents, but typically was a percentage of a variable rate index.  The penalty rate was intended to compensate investors for the short-term loss of liquidity as well as to encourage the issuer to take steps to resolve the condition which caused the auction failure prior to the subsequent auction.

7.  Investors were typically attracted to ARS on account of their AAA rating, favorable tax treatment, and premium

4

interest rates, which were often higher than those available in short term money market accounts, commercial paper, certificates of deposits, or tax-exempt variable rate demand notes.

8.  In March 2005, the Securities and Exchange Commission ("SEC") issued a release stating that it was inappropriate to classify auction rate securities as cash equivalents because of the liquidity risks involved in these holdings. *See* Exhibit 120.  The Release noted that "[auction rate securities are considered highly liquid by market participants because of the auction process." *Id.*  It also cautioned that "auction rate securities have long-term maturity dates and there is no guarantee the holder will be able to liquidate its holdings" and that "[the holder does not have the right to put the security back to the issuer." *Id.*

9.  Nonetheless, from the time of their introduction in the early 1980's until 2007, the ARS markets operated almost perfectly, and during that time, only thirteen auctions failed.  These isolated auction failures were typically the result of financial difficulties of the issuer or its insurers.  During this time, ARS underwriters, including Defendant, routinely placed "supporting bids" for their

own accounts when auctions would have otherwise failed. The underwriters typically held the purchased ARS in inventory for eventual resale.

10. By the end of 2007, the market for ARS had peaked, with over $330 billion worth of ARS outstanding.  Many municipal ARS were insured by monoplane insurers which agreed to assume interest and principal payments in the event of default by the underlying issuer.  When these insurers' credit ratings were downgraded and placed on credit watch, some investors stopped purchasing ARS, causing thirty-one auctions to fail from June until December of 2007.  Most of the auction failures in 2007 were related to collateralized debt obligation ARS, which were particularly affected by the deteriorating conditions in the sub-prime housing sector in 2007.

11. In early February 2008, as credit markets continued to tighten, ARS auction failures became even more prevalent, causing investors to demand even higher rates of return on account of greater perceived risk.  As the markets worsened and concerns over growing ARS inventories increased, a few major banks and broker- dealers began refraining from bidding at auctions, allowing auctions to fail.  As more broker-dealers withdrew support from their

6

auctions, and more auctions began to fail, retail investors panicked and abandoned the ARS market, causing a massive supply/demand imbalance. As a result, the market for ARS experienced a wholesale collapse, and virtually every subsequent auction has failed, crippling the ability of investors to escape their positions in ARS. To date, the ARS market has not recovered.

**III.** **Plaintiffs' Purchase of the Series 2004B Bonds**

**12.** Mr. Fishman's history as an ARS investor predates the purchase giving rise to the instant litigation. He began purchasing ARS as early as August 2002, almost three years prior to the purchases in dispute in this suit. Specifically, he purchased $1,000,000 worth of Kentucky Economic Development ARS bonds in an account held at Goldman Sachs. Additionally, he directed three other purchases and ten sales of ARS in the Goldman Sachs account during the period of August 2002 until May of 2005. Mr. Fishman also made 11 separate purchases of other ARS in investment accounts held at Leg. Mason Wood Walker, which is now known as Morgan Stanley Smith Barney, in or around May 2005.

**13.** Plaintiffs maintained investment accounts at Waters Parker

7

son & Company ("WACO"), a registered investment advisor located in New Orleans, Louisiana. Plaintiffs paid WACO an annual fee based upon the amount of assets under its control.

14. WACO was an institutional customer of Morgan Keegan. Mr. Fishman acted with authority at all pertinent times in this matter with respect to trades made for the Plaintiffs' WACO accounts. At some time in early May of 2005, and based on his previous experience investing in ARS, Mr. Fishman contacted George Griswold, a friend and investment advisor at WACO, to instruct him to find an issue of ARS for Plaintiffs' WACO accounts.

15. George Griswold identified an issue of ARS underwritten and sold by Morgan Keegan called the Louisiana Local Governmental Environmental Facilities and Community Development Authority Revenue Bonds Series 2004B ("the Series 2004B Bonds"). Morgan Keegan underwrote approximately $15,000,000 worth of the Series 2004B Bonds in August of 2004. The maturity date of the Series 2004B Bonds is August 1, 2034.

16. On May 5, 2005, WACO purchased $525,000 of the series 2004B ARS bonds in its institutional account with Morgan Keegan. Of the $525,000 purchased, $500,000 was purchased

8

at the direction of Mr. Fishman on behalf of Plaintiffs and was later distributed to Plaintiffs' WACO accounts. $100,000 was distributed to Elise Y. Fishman's account (the Succession account), and $200,000 in each of the Trust accounts.

17. WACO failed to conduct due diligence with respect to the purchase of the Series 2004B Bonds on behalf of Plaintiffs.  The testimony of WACO representatives at trial reveals that they fundamentally misunderstood the way that ARS operated.

18. At all relevant times, WACO was an institutional customer of Morgan Keegan.  Accordingly, in keeping with its normal policies, Morgan Keegan did not advise WACO in connection with its purchases of securities.

19. Between the time of WACO's purchase of the Series 2004B Bonds and mid-2008, WACO did not speak with Morgan Keegan concerning Plaintiffs' Series 2004B Bonds.  Plaintiffs never spoke with anyone at Morgan Keegan regarding the Series 2004B Bonds.

20. In 2006, in a highly reported and publicized announcement, the Securities and Exchange Commission reported that it had settled an investigation into fifteen firms, including Defendant Morgan Keegan, who were participants in the ARS

market.  The investigation related to the adequacy of disclosures relating to the firms' practices of placing bids for their own accounts in ARS auctions.  As a part of this settlement, Morgan Keegan was ordered to make available a written description of its material ARS practices and procedures.  In response, Morgan Keegan posted a disclosure on its public website which contained, among other things, information regarding its practices regarding bidding at auctions.  Specifically, the disclosures which Morgan Keegan posted on its public website indicated that "Morgan Keegan is permitted, but not obligated to submit orders in Auctions for its own account . . . and routinely does so in its sole discretion."  *See* Exhibit 44 at 3.

21. Further, it expressly disclosed that Morgan Keegan may bid for its own account to prevent an auction failure but also stated that investors "should not assume . . .that Morgan Keegan will [continue to place bids] or that Failed Auctions will not occur."  *Id.* at 3-4.  These disclosures were subsequently updated in June 2007 to track the Securities Industry Financial Market Association's ("SIGMA") guidelines regarding ARS.

22. Following the collapse of the ARS markets in February

10

2008, Morgan Keegan implemented a voluntary program to incrementally repurchase ARS from certain investors in 2009.  The repurchase program did not include ARS sold to institutional accounts or ARS purchased in a Morgan Keegan account and subsequently transferred to other firms.  Because Plaintiffs had purchased the Series 2004B Bonds in WACO's institutional account with Morgan Keegan, they were excluded from the terms of the voluntary repurchase agreement.  Because they have been unable to find an alternative market, and because the auctions have continued to fail, the Plaintiffs continue to hold the bonds.

23. The Series 2004B Bonds have not defaulted and continue to pay the penalty interest rate.  With their current A rating, the penalty rate for the Bonds is 175% of the SIGMA Swap Index, which is an index comprised of over 90% of all outstanding 7-day Variable Rate Demand Note yields.  Because the SIGMA Index is at only 0.21%, however, the penalty rate for the Series 2004B bonds is only about 0.40%.

## CONCLUSIONS OF LAW

## IV.  Claims Under §10(b) of the Exchange Act & Rule 10b

24. Rule 10b-5 makes it illegal to do three things: (1) to

employ any device, scheme, or artifice to defraud; (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or; (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.  In order to prevail on a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–342 (2005)).  For the reasons that follow, the Court concludes that Plaintiffs have not established Morgan Keegan's liability under section 10(b) of the Exchange Act and Rule 10b-5.

## A. <u>Reliance</u>

25. Even assuming that Morgan Keegan *did* make material misstatements or omissions, the Court finds that Plaintiffs have failed to establish that they ever relied on any misrepresentation made by Morgan Keegan, as required under Section 10(b). Requiring "proof of reliance ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" *Erica P. John Fund, Inc. V. Halliburton Co.*, 131 S.Ct. 2179, 2184-2185 (2011)(quoting *Basic Inc. V. Levinson*, 485 U.S. 224, 243 (1988)). The most direct means of proving reliance is by showing awareness of a material misstatement and a subsequent resulting purchase of the security as a result of that specific misstatement. If the investor was unaware of the relevant statement, however, he could not establish reliance on that basis. *Id.*

26. Investors may also establish a rebuttable presumption of reliance in other ways. First, if the gravamen of the alleged fraud is an omission of material fact by a Defendant with a duty to disclose, an investor is not required to prove reliance. *See Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153-54 (1972).

This judicially created presumption "responds to the reality that a person cannot rely upon what he is not told." *Smith v. Ayres,* 845 F.2d 1360, 1363 (5th Cir. 1988). In order to invoke the *Affiliated Ute* presumption of reliance on an omission, a plaintiff must (1) allege a case primarily based on omissions or non-disclosure and (2) demonstrate that the defendant owed him a duty of disclosure. *Regents of University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 384 (5th Cir. 2007). Here, Plaintiffs have alleged that they would not have purchased the Series 2004B Bonds had Morgan Keegan not misrepresented the liquidity risks associated with ARS and had disclosed that it placed "support bids" when an auction could otherwise fail. Here, under these facts, the presumption of reliance under *Affiliated Ute* is inapplicable.

27. First, Plaintiffs must allege a case primarily based on omissions or non-disclosure of material facts. The Fifth Circuit has held that the *Ute* presumption is limited to cases "in which the complaint is grounded primarily in allegations that the defendant has failed to disclose any information whatsoever relating to material facts about which the defendant has a duty to the plaintiff to

14

disclose." *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1119 (5th Cir. 1988)(*vacated on other grounds sub nom.* Fryar v. Abell, 492 U.S. 914 (1989). In *Abell,* a group of investors holding bonds issued by a non-profit company sued the non-profit's developer, attorneys, and various other parties associated with the bond offering for violations of Rule 10b-5 on account of alleged misrepresentations and omissions in the offering documents. The Fifth Circuit rejected the plaintiffs' claims that they had established reliance by virtue of the *Ute* presumption, explaining that "*Ute* . . . does not require the burden of persuasion to shift in cases where the plaintiffs allege either that the defendant has made false statements or has distorted the truth by making true but misleading incomplete statements." *Id.* Even though there were some allegations that certain information had been completely omitted from the offering statement, the Court still found the claims were primarily that they had been given a misleading impression of the offering, and thus that the *Affiliated Ute* presumption was inapplicable. *Id; see also Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.*, 412 F.3d 103, 109 (2nd Cir. 2005)(the *Affiliated Ute* presumption does not apply when the

15

omissions merely "exacerbate the misleading nature of the alleged conduct").  Here, similarly, the gravamen of the Plaintiffs' claims is that Morgan Keegan's marketing materials were deceptive and contained material misrepresentations because they marketed ARS as safe and liquid investments.  The omissions alleged  – namely that Morgan Keegan placed bids for its own account – relate primarily to the misrepresentation of the liquidity risk of ARS.  Accordingly, Plaintiffs have not established that their case was "primarily" based on allegations of non-disclosure, and the  presumption of reliance is therefore inapplicable.

28. Further, even assuming the Plaintiffs have established that the *Affiliated Ute* presumption attached, the Court finds that it was rebutted.  When the Ute presumption attaches, a defendant may rebut it by showing that the plaintiff did not rely on the defendant's duty to disclose in entering the disputed transaction.  *Shores v. Sklar*, 647 F.2d 462, 468 (5th Cir. 1981).  Plaintiffs maintained no accounts with Morgan Keegan and never actually even communicated with anyone at Morgan Keegan prior to the purchase of the Series 2004B Bonds.  Instead, Plaintiffs maintained their investment accounts with WACO, and thus

have attempted to rely on a chain of reliance – they claim to have relied on WACO, who relied on Defendant's misrepresentations and duty to disclose.  The Court does not find this explanation to be credible for several reasons.  First, the evidence shows that Morgan Keegan did not advise WACO with respect to the purchase of the Series 2004B Bonds because WACO was an institutional customer of Morgan Keegan.  Second, and more importantly, the evidence does not suggest that Mr. Fishman or WACO relied on Morgan Keegan's duty to disclose in the decision to purchase the Series 2004B Bonds.  Mr. Fishman is a sophisticated investor who has enjoyed a successful career as an attorney with expertise in both corporate and securities law.[1]  He maintained authority and discretion over trades made in Plaintiffs' WACO accounts.  There was no evidence that he sought any substantive advice from WACO or Morgan Keegan concerning his purchase of the Series 2004B Bonds or read any of Morgan Keegan's marketing materials.  Instead, Mr. Fishman essentially admitted that he did not rely on any misstatement or omission by Morgan Keegan in the purchase of these bonds.  Instead, his testimony shows

---

[1]     *See* Attorney Profile of Louis Y. Fishman, http://www.cfhlaw.com/attorneys/louis_y_fishman.htm (last visited October 4, 2011).

that he instructed WACO to select an issue of ARS for him to purchase based on the success of his prior ARS investments with several other brokerage firms. While Plaintiffs insist that WACO never would have facilitated the purchase of the bonds had Morgan Keegan disclosed the liquidity risks inherent in ARS investments in its marketing materials, the Court finds the evidence adduced at trial belies this assertion. The testimony of WACO officials revealed that it failed to conduct the required due diligence before fulfilling Plaintiffs' orders, even though it had never purchased ARS for its clients at any previous point in time. Both George Griswold and Stephen Casamento appeared to lack a fundamental understanding of how ARS actually operate in the first instance.[2] Accordingly, the Court finds unpersuasive the claims that the events would have been different had Morgan Keegan only provided WACO additional or different information. As a result, Plaintiffs have not established reliance under the *Affiliated Ute* presumption.

**29.** Alternatively, with respect to material misstatements,

---

[2]    Specifically, Mr. Griswold stated that he understood that ARS bonds had a "put" feature which allowed the purchaser to put the security back to Morgan Keegan, and that the interest rate for the bonds would be set by "the market" and not by auction.

investors may establish reliance under the "fraud on the market" theory.  The "fraud on the market" theory posits that "all public information concerning a company is known to the market and reflected in the market price of the company's stock." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009)(quoting *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 661 n.6 (5th Cir. 2004).  When an investor purchases a security on an efficient market, then, courts may presume that he relied on the integrity of the market price –  i.e., "that no unsuspected manipulation ha[d] artificially inflated the price." *Id.* (internal quotation marks omitted).  In order to establish reliance under the fraud on the market theory, a plaintiff must prove (1) the defendant made material misrepresentations to the public; (2) the shares of the security at issue were traded in an efficient market; and (3) that the plaintiffs traded shares between the time of the dissemination of the misrepresentation and the time that the truth was disclosed.  *Id.*
Once a plaintiff has established that the presumption applies, "any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a

fair market price, will be sufficient to rebut the presumption of reliance." *Basic Inc. v. Levinson*, 485 U.S. 224, 248, (1988).  The Supreme Court gave several examples of showings sufficient to rebut the presumption of reliance:  if the market makers did not believe the material misstatements and therefore did not take actions which would affect the price of the security; if there were corrective disclosures which credibly entered the market and corrected the effects of the misstatements prior to the disputed transaction; or if the plaintiff himself did not subjectively rely on the misstatements. *Id.*

30.  Here, the Court finds that Plaintiffs simply failed to submit the evidence required to invoke the fraud on the market presumption of reliance.  Specifically, Plaintiffs failed to submit any evidence whatsoever that the Series 2004B Bonds were traded on an efficient market, and indeed did not even plead this fact in their Complaint, as required to invoke the fraud on the market theory.  In order to determine whether a security is traded in an efficient market, courts must consider factors which include  "(1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the

number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock." *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 n.10 (5 th Cir. 2005)(citing *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005)).  Plaintiffs simply failed to offer evidence on any of these considerations.

**31.**  Furthermore, the fraud on the market theory appears to be inapplicable to the facts of this case.  The evidence shows that Plaintiffs purchased the Series 2004B Bonds directly from Morgan Keegan through WACO – not on any efficient market.  The logic of the fraud on the market theory as laid out in *Basic* is that the market price provides the causal link to the defendant's misrepresentations because the market price, upon which

the investor relies, reflects that misrepresentation. Here, Plaintiffs make no allegations that Morgan Keegan's misstatements artificially inflated the price of the bonds.

32. At best, perhaps, the evidence offered at trial could be construed as attempting to prove that Morgan Keegan's allege misstatements or omissions created the market in the first instance.  Indeed, Plaintiffs have noted in a footnote in post-trial memoranda that the Fifth Circuit follows the "fraud created the market" theory.  The "fraud created the market theory," like the fraud on the market theory, relieves a plaintiff of the burden of proving that he specifically relied on a defendant's misstatements in some circumstances.  Under the fraud created the market theory, if a defendant introduces an "otherwise unmarketable security" to the market through fraud, a plaintiff can prove that he relied on the integrity of the market itself, as opposed to proving reliance on individual material misstatements.  *See Shores*, 647 F.2d at 469-70 & n. 8.  The Fifth Circuit has explained that "[the basis of the fraud-created-the-market theory is that the fraudster directly interfered with the market by introducing something that is not like the others: an

22

objectively unmarketable security that has no business
being there." *Regents of University of California*, 482
F.3d at 391.  The theory, however, is very narrow, and the
only circumstances in which it may be invoked are "where
the promoters knew the enterprise itself was patently
worthless when the securities were issued, and
successfully issued the securities only because of [their]
fraudulent scheme." *See Abell*, 858 F.2d at 1122-23
(holding that fraud created the market theory was
inapplicable when bonds had *some* value, even though that
value had been misrepresented in the offering statement).

33.  Plaintiffs contend that if underwriters of ARS like the
Series 2004B Bonds did not artificially create a market
for these securities by placing bids at auctions, no
market would otherwise exist.  Plaintiffs failed to offer
such proof at trial, however.  For almost 25 years, ARS
were considered a suitable investment by many investment
advisers and investors alike.  Auction failures virtually
never occurred, and when they did occur, ARS penalty rates
provided issuers sufficient incentives to correct the
conditions giving rise to the failure, or alternatively,
to refund the issue and seek alternative financing
sources.  Even now, although the bonds remain illiquid,

they have not defaulted and continue to pay interest.
Furthermore, should short-term interest rates rise, the
penalty rate for the Series 2004B Bonds would also rise
with them.  Accordingly, there is no evidence that these
bonds were worthless from their inception and were only
successfully issued because of Morgan Keegan's alleged
misstatements and omissions.  Thus, no presumption of
reliance is applicable under any of the three theories
cited by Plaintiffs.

34. Plaintiffs have not otherwise offered credible evidence
that they in fact relied on anything Morgan Keegan
represented or failed to disclose.  As previously noted,
Mr. Fishman essentially admitted that he was not relying
on anything Morgan Keegan represented or failed to
represent in purchasing the Series 2004B Bonds.  His past
experience as an ARS investor, like that of many other ARS
investors, led him to believe that they were a suitable
investment, irrespective of anything Morgan Keegan did,
said, or failed to say.  Accordingly, Plaintiffs have
failed to establish reliance.

**B. <u>Loss Causation</u>**

35. Loss causation requires an investor to show a causal
relationship between his damages and the defendant's

material misstatement or omission.  An investor must show
that the misstatement or omission *itself* is the actual
cause of his economic loss, as opposed to "changed
economic circumstances, changed investor expectations, new
industry-specific or firm-specific facts, conditions, or
other events." *Dura Pharmaceuticals, Inc. v. Broudo*, 544
U.S. 336, 342 (2005).  Plaintiffs contend that they have
established loss causation because they, like other
investors, relied on Morgan Keegan's marketing materials
and alleged misrepresentations and omissions in purchasing
the Series 2004B Bonds, and suffered economic loss due to
the market collapse and resulting illiquidity caused when
the truth regarding Morgan Keegan's participation at the
auctions was disclosed.

36. Here, the Court finds that Plaintiffs have also failed to
establish loss causation.  Even accepting that Morgan
Keegan materially misrepresented or omitted the truth
regarding the liquidity risks of ARS or the nature of its
participation in auctions, the Court finds that corrective
disclosures were disseminated to the market as a result of
the SEC's Cease and Desist Order of May 31, 2006, and then
subsequently in June of 2007 when Morgan Keegan's written
disclosures regarding ARS were updated pursuant to the SEC

Order.  In particular, Morgan Keegan's expert, who the
Court finds to be highly credible, testified that the 2006
SEC Settlement was widely publicized, and that
"[v]irtually every financial markets newswire and
publication carried reports of the investigation and
settlement." *See* Exhibit 120, pg. 32.  However, when this
information was disclosed to the market, there was no
immediate or drastic effect on the liquidity of the Series
2004B Bonds, or other ARS, for that matter.  To the
contrary, it was not until February of 2008, when the
overall market for ARS collapsed, that the Plaintiffs'
alleged economic loss resulted.  Furthermore, Morgan
Keegan's expert credibly testified that the February 2008
collapse of the ARS markets and the subsequent prolonged
liquidity was a "100 year event" resulting from the
convergence of several unforeseen factors, including
dislocation in the credit markets, the sub-prime housing
crisis, and unprecedented low short-term interest rates.
Accordingly, the Court finds that Plaintiffs have failed
to establish that the conduct of Morgan Keegan caused
their alleged losses, as opposed to other concurrent
causes such as "changed economic circumstances, changed
investor expectations, new industry-specific . . . facts,

conditions, or other events." *Dura Pharmaceuticals*, 544
U.S. at 342.

37. Furthermore, the evidence at trial also showed that
Plaintiffs and their agent and registered investment
advisor WACO had constructive, if not actual, notice of
the information they claim was misrepresented or not
disclosed well in advance of the collapse of the ARS
markets at the end of February 2008. Plaintiffs and WACO
were given notice of the fact that Morgan Keegan was
placing bids for its own account in ARS auctions by virtue
of the widely publicized May 31, 2006 SEC Settlement.  As
was acknowledged by the WACO representatives who testified
at trial, WACO had a fiduciary duty as Plaintiffs'
registered investment advisor to stay abreast of such
industry-wide developments regarding their clients'
investments and to evaluate the propriety of continuing to
invest in ARS.  Furthermore, in accordance with the terms
of this settlement, Morgan Keegan sent a written notice of
the risks associated with ARS to all investors who had
purchased ARS from Morgan Keegan prior to its settlement
with the SEC in 2006, including Plaintiffs.  These
disclosures explain the liquidity risks associated with
ARS, as well as laying out in specific detail Morgan

Keegan's participation in ARS markets.  The disclosures
explained in a clear and straightforward manner that
Morgan Keegan routinely placed bids for its own account,
that it placed bids to prevent failed auctions, that it
was under no obligation to continue to place such bids,
and that holders of ARS may be unable to sell their
securities in the event of failed auctions.  This
information was also posted on Morgan Keegan's website.
In light of these disclosures, and the widespread
availability of the information contained therein,
Plaintiffs and their agent and registered investment
advisor WACO had sufficient notice of the information they
claim was misrepresented or not disclosed.  Indeed, in
examining the adequacy and availability of Morgan Keegan's
disclosures regarding ARS after the SEC settlement, one
federal court recently concluded that "with the exercise
of reasonable diligence, any customer could find
information regarding the risks associated with the ARS
products." *S.E.C. v. Morgan Keegan*, --- F. Supp. 2d ---,
2011 WL 2559362 (N.D. Ga. 2011); *see also In re Merrill
Lynch Auction Rate Securities Litigation*, 704 F. Supp. 2d
378, 397 (S.D.N.Y. 2010)(finding that the  allegedly
concealed information regarding the liquidity risks of ARS

28

and Merrill Lynch's practice of bidding in ARS auctions
was "widely available, easily accessible, and disclosed in
detail" in several sources, including the 2006 SEC
Settlement, Merrill Lynch's website, and prospectuses").
Had either Plaintiffs or their registered investment
advisor conducted even minimal diligence regarding their
investments, they would have easily discovered the
information and risks that they claim were misrepresented
or not fully disclosed, either from Morgan Keegan itself
or from any other number of other resources, and would
have clearly been able to liquidate their position in the
Series 2004B Bonds well in advance of the collapse of the
ARS markets at the end of February 2008.  As sophisticated
investors, neither Plaintiffs nor WACO can simply disclaim
knowledge of these public disclosures.  *See In re Merrill
Lynch Auction Securities Litigation*, 758 F. Supp. 2d 264,
278-79 (S.D.N.Y. 2010)(finding that, after Merrill Lynch
disclosed its bidding practices and the risks of auction
failures pursuant to the 2006 SEC settlement, plaintiff
who had not acted on this information could not thereafter
assert that any misstatements caused its losses).[3]

---

[3]    The plaintiff in the *In re Merrill Lynch Securities
Litigation* case was an issuer of ARS bonds that failed
to convert its interest rate structure after the

Accordingly, for this additional reason, Plaintiffs have not established that any alleged misstatements or omissions by Morgan Keegan caused their loss.

## V. **Claims Under the Louisiana Blue Sky Law**

38. In order to prevail on a claim for securities fraud under the Louisiana Blue Sky Law, Plaintiffs must have established that "(1) the defendant made a false or misleading statement of a material fact or failed to state a material fact necessary in order to make the statement not misleading; (2) the plaintiff did not know of the untruth or omission; (3) the defendant knew, or in the exercise of reasonable diligence, could have known, of the untruth or omission." *Ponthier v. Manalla*, 06-632 (La. App. 5 Cir. 1/30/07), 951 So. 2d 1242, 1255 (citations

---

disclosure of Merrill Lynch's bidding practices pursuant to the SEC Settlement. For a year after the disclosures, while the ARS bonds paid a lower interest rate, the plaintiff did not act. When the auctions began to fail and the bonds reset to a penalty rate, it filed suit, alleging that Merrill Lynch's misstatements regarding its bidding practices and the risks of auction failure caused economic loss. While the factual posture of the case is different from that of the instant case, the Court finds the principle is the same. Plaintiffs and their investment advisor were armed with the same disclosures and the same publicly available information that they claim was concealed and thus did not establish that any alleged misstatements or omissions caused their losses.

omitted).

39. Loss causation is also an essential element of Plaintiffs'
    claims under Louisiana's Blue Sky Law.  *See Williams v.
    Edward D. Jones & Co.*, 556 So. 2d 914, 916 (La. App. 3
    Cir. 1990)(explaining that a claim under the Louisiana
    Blue Sky Law "is governed by the causation standard
    articulated in numerous federal cases interpreting federal
    securities law").  Accordingly, for the same reasons as
    articulated above in paragraphs 35-37, Plaintiffs' have
    failed to establish causation with respect to their state
    law claims.

**40.** Furthermore, Section 712(A)(2) of the Louisiana Blue Sky
    Law specifically provides that a buyer may only maintain a
    claim for securities fraud if "in the exercise of
    reasonable care [he] could not have known of the untruth
    or omission."  Here, as previously discussed, the Court
    finds that Plaintiff and its registered investment advisor
    WACO could have easily discovered any alleged
    misrepresentation or omission regarding the Series 2004B
    Bonds through the exercise of reasonable diligence.
    Accordingly, Plaintiffs cannot recover under the Louisiana
    Blue Sky Law.

## VI. <u>Conclusion</u>

Accordingly, and based on all the foregoing Findings of Fact and Conclusions of Law,

Judgment will hereafter be entered in favor of Defendant Morgan Keegan and against Plaintiffs.

New Orleans, Louisiana, this 13th day of October, 2011.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

32